UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

ELAINE LOCKLEAR, as Personal
Representative and Administrator of the
Estate of Johnnie Locklear

      PLAINTIFF

v.                                                  CASE NO: 4:16-CV-85

COMMANDER DOUGLAS HERALD,
Individually, and in his official capacity as
Scott County Jail Commander
Scott County Security Center
111 South 1st St
Scottsburg, IN 47170

And

SHERIFF DAN MCCLAIN,
In his official capacity as Scott County Sheriff
Scott County Security Center
111 South 1st St
Scottsburg, IN 47170

OFFICER LINDSAY JOHNSON, individually
Scott County Security Center
111 South 1st St
Scottsburg, IN 47170

and

OFFICER JAMES SCOTT MCCOSKEY, individually
Scott County Security Center
111 South 1st St
Scottsburg, IN 47170

and

OFFICER MICHAEL RICHEY, individually
Scott County Security Center
111 South 1st St
Scottsburg, IN 47170

1

and

OFFICER ROBERT BAUGHMAN, individually
Scott County Security Center
111 South 1st St
Scottsburg, IN 47170

and

OFFICER RACHAEL HARDIN, individually
Scott County Security Center
111 South 1st St
Scottsburg, IN 47170

DEPUTY JOSEPH JOHNSON, individually
Scott County Sheriff's Office
111 South 1st St
Scottsburg, IN 47170

and

DEPUTY JOE GUARNERI, individually
Scott County Sheriff's Office
111 South 1st St
Scottsburg, IN 47170

and

DEPUTY JEREMY ARNOLD, individually
Scott County Sheriff's Office
111 South 1st St
Scottsburg, IN 47170

and

DR. NADIR AL-SHAMI, individually
2100 Market Street, Suite 102
Charlestown, IN 47111

and

ADVANCED CORRECTIONAL HEALTHCARE, INC.
3922 W. Baring Trace
Peoria, IL  61615

    SERVE:    CT Corporation System
                      150 West Market St
                      Indianapolis, IN 46204

and

NURSE DENISE L/N/U
111 South 1st St
Scottsburg, IN 47170

and

SCOTT COUNTY, INDIANA
    SERVE:    Commissioner Kelley Robbins
                      One E McClain Ave, Suite 130
                      Scottsburg, IN 47170

    DEFENDANTS

## COMPLAINT

### INTRODUCTION

1. Plaintiff Elaine Locklear files this action as Personal Representative and Administrator of the Estate of Johnnie Locklear, through counsel, against Scott County and its Sheriff's Department's officers, deputies, and contractors for excessive force against Johnnie Locklear and for acting with deliberate indifference to the serious medical needs of Johnnie Locklear while he was under their care and supervision, which ultimately led to his death.

### JURISDICTION AND VENUE

2. Plaintiff seeks actual, compensatory, and punitive damages from Defendants under the Civil Rights Act of 1871, 42 U.S.C. § 1983, for gross and unconscionable violations of the rights, privileges, and immunities guaranteed by the

Fourth, Fifth, Ninth, and Fourteenth Amendments to the Constitution of the United States.

3. This Court has jurisdiction over this case pursuant to the provisions of 28 U.S.C. §1331 and § 1343.

4. As Scott County, Indiana is the location of all acts on which Plaintiff's claims are based, venue is proper in this Court.

## PARTIES

5. Plaintiff Elaine Locklear ("Plaintiff") is the daughter and Personal Representative and Administrator of the Estate of Johnnie Locklear.

6. Johnnie Locklear ("Locklear"), deceased, was a resident of Scott County, Indiana.

7. Defendant Sheriff Dan McClain is, and at all times relevant herein was, the elected Sheriff of Scott County Indiana, and was responsible for the conditions in the Scott County Jail, for the establishment of policies either formally or by custom or practice, and for the employment, training, supervision, and conduct of the officers and employees of the Sheriff Department and Jail. McClain is named in his official capacity.

8. Defendant Douglas Herald ("Herald") is, and at all times relevant herein was, the Jail Commander for the Scott County Jail and was responsible for the conditions in the Scott County Jail, for the establishment of policies either formally or by custom or practice, and for the employment, training, supervision, and conduct of the officers and employees of the Jail. Herald also directly managed the treatment and detention of Locklear while he was held in the Scott County Jail. Herald is named in his individual capacity and his official capacity as Scott County Jail Commander.

9. At all times relevant herein, Defendants Lindsay Johnson, James Scott McCoskey, Michael Richey, Rachael Hardin, and Robert Baughman were jail officers in the Scott County Jail and participated in the unlawful and unconstitutional treatment of Locklear.

10. At all times relevant herein, Defendants Joseph Johnson, Joe Guarneri, and Jeremy Arnold were deputies employed by the Scott County Sheriff's Office and participated in in the unlawful and unconstitutional treatment of Locklear.

11. At all times relevant herein, Defendant Dr. Nadir Al-Shami was employed by Advanced Correctional Healthcare, and, by contract with the Scott County Jail, was responsible for providing medical care to inmates and detainees thereof.

12. Advanced Correctional Healthcare, Inc. is foreign corporation organized under the state laws of Illinois and a doing business in the state of Indiana, and was responsible for providing medical care to detainees of Scott County Jail at all times relevant to this Complaint, as well as setting policies and procedures to be followed by its own staff as well as Scott County Jail officers.

13. Nurse Denise l/n/u is believed to be an employee of Advanced Correctional Healthcare, Inc. and/or Scott County and was charged with providing healthcare to inmates in the Scott County Jail. Nurse Denise l/n/u was responsible for Locklear's care during the period relevant to this Complaint.

14. Defendant Scott County, Indiana is responsible for the conditions in the Scott County Jail, for the establishment and promulgation of policies either formally or by custom and practice for both the Scott County Jail and the Scott County Sheriff's

Department, and for the employment, training, supervision and conduct of Sheriff's deputies and the officers and employees of the Jail.

## FACTUAL ALLEGATIONS

15. On June 11, 2014 at approximately 8:20 p.m., Scott County Sheriff's Deputy Joe Guarneri was dispatched to 333 East Booe Road in response to a call about a male in the caller's back yard.

16. Upon arriving at the caller's residence, Deputy Guarneri and Deputy Jeremy Arnold met Johnnie Locklear, the decedent represented by the Plaintiff Estate in this lawsuit.

17. Locklear was wearing jean shorts and was kneeling in a wooded area.

18. Deputy Guarneri observed that Locklear "seemed very confused."

19. Locklear told Guarneri and Arnold that "he was going to pray" and called the deputies "Judas."

20. Locklear advised the deputies that he did not know where he was or why he was in the woods.

21. Officers led Locklear to the front of the residence, purportedly to be assessed by EMS.

22. Upon information and belief, EMS was never dispatched, nor did EMS ever assess Locklear on June 11, 2014.

23. Locklear then began to run from the deputies, at which point Guarneri and Arnold followed Locklear and apprehended him, using, among other methods, tasers and pepper spray.

24. At that point, neighbors confirmed Locklear's identity, and advised Guarneri and Arnold that Locklear "had been acting strange the last three days and has had no sleep."

25. Locklear was then arrested on suspicion of resisting law enforcement and fleeing law enforcement, both misdemeanors.

26. Locklear was detained on an emergency basis pursuant to IC 12-26-5-1.

27. Guarneri and Arnold transported Locklear to the Scott County Jail.

28. Upon arriving at the Scott County Jail at approximately 9:15 p.m., Locklear was escorted by Defendant Officers Baughman and Richey, in handcuffs, to a padded cell.

29. Locklear was fully compliant with Baughman and Richey's instructions.

30. Once inside the padded cell, Baughman and Richey instructed Locklear to remove the remainder of his clothing.

31. Upon information and belief, Locklear did not understand or was unable to comply with Baughman and Richey's instructions to remove his pants.

32. At no point in time did Locklear pose a threat to officer safety.

33. At no point in time prior to the instruction to remove his clothing was Locklear ever evaluated by a mental or other health professional, nor was any risk of suicide or other self-harm evaluated by Defendants.

34. Richey tased Locklear as a punitive measure for his refusal or inability to comply with the officers' instruction to remove all of his clothing.

35. Baughman pepper-sprayed Locklear, even when he was fully compliant and had been tased, as a punitive measure for his refusal or inability to comply with the officers' instruction to remove all of his clothing.

36. In an effort to get relief from the effects of the pepper spray, Locklear used water from the drain in the cell floor, which upon information and belief is regularly urinated into by other inmates, for approximately 10 minutes before officers provided clean water.

37. For the rest of June 11 into June 12, 2014, Locklear demonstrated delusional behavior, including claiming to be Barack Obama, and frequently attempted to get the attention of jail officers.

38. On June 12, 2014 at approximately 8:30 a.m., Officers contacted Lifespring, a mental health provider, to conduct an emergency assessment of Locklear's mental state.

39. When Officers called Lifespring, they informed the office of Locklear's delusional behavior, including Locklear's claim that he was Osama Bin Laden and that he planned to blow up the White House.

40. A Lifespring therapist, Dorothy Hickerson, evaluated Locklear on June 12, 2014.

41. Locklear told Hickerson that he did not know where he was or why he was there, denied any use of drugs or alcohol with the exception of "some alcohol" the previous night, and did not show physical signs of withdrawal.

42. Hickerson concluded that Locklear was delusional, but not aggressive or combative, and advised further monitoring.

43. Locklear spent the remainder of June 12 at the door to his cell yelling, and beating on the door to the padded cell.

44. On the morning of June 13, 2014, Sally Johnson, another Lifespring therapist, called Defendant Herald, the Scott County Jail Commander, to get an update on Locklear's status.

45. Herald informed Johnson that Locklear still had not slept for at least 5 nights.

46. Herald further informed Johnson that Locklear had been pacing his cell, occasionally getting down on his knees to pray, was still naked, was more delusional, and was less in touch with reality than he was the day before.

47. Herald further told Sally Johnson that a friend of Locklear's had visited Herald and told him that Locklear did not have any past legal or drug problems and that Locklear "had been exhibiting increasingly more bizarre behavior in the days building up to his arrest."

48. Sally Johnson visited the jail at approximately 12:45 p.m. on June 13 to perform a second evaluation. On a video monitor, she observed Locklear completely naked, pacing his cell and flailing his hands about. When Johnson attempted to ask Locklear if he knew who or where he was, Locklear responded by yelling out random numbers and covering the window to his cell with his smock.

49. Sally Johnson concluded that Locklear's "delusional state and total lack of any judgment made it clear that [he] was in need of emergency detention for the protection of himself and/or others."

50. Sally Johnson called nearby psychiatric facilities to arrange treatment for Locklear and received two rejections, but was waiting for a response from a third facility, Centerstone.

51. While Sally Johnson waited to find Locklear a placement, Defendant Herald informed her that Locklear's sister was traveling from North Carolina to bond Locklear out of jail.

52. Defendant Herald called Sally Johnson again and told her it was confirmed that someone was coming to bond Locklear out of jail. Herald told Johnson to stop looking for a medical facility to take Locklear.

53. Later that day, Centerstone returned Johnson's call. She did not respond, assuming Locklear had been released.

54. Jail records from June 13 indicate that Locklear was yelling and screaming, punching the wall of his cell, drawing a map to the North Pole on the floor of his cell, asking for a Budweiser and a cold Pepsi, yelling "stop," talking to the walls of his cell, and walking around screaming very loudly, hitting the wall, talking to nobody, crawling and rolling around, and digging things out of the drain meant for waste in the cell floor.

55. Despite this behavior and despite Sally Johnson's evaluation, Herald instructed the search for a facility for Locklear to cease.

56. Despite his obvious medical need and state of delusion, there is no record of any medical professional treating, evaluating, or even seeing Locklear at any time, and no record of any consultation with any such medical professional until, at the earliest, the morning of June 13, 2014.

57. Upon information and belief, Defendant Nurse Denise generated one page of medical progress notes on the morning of June 13, 2014. These notes do not indicate that Unknown Nurse Denise ever even saw Locklear, but nonetheless indicate that he has urgent and obvious medical needs. The notes, which are believed to be signed by Unknown Nurse Denise, are attached hereto as **Exhibit A**.

58. On the evening of June 13, 2014, Officer Richey finally contacted Defendant Dr. Nadir Al-Shami, a physician employed by Advanced Correctional Healthcare. Officer Richey told Dr. Al-Shami that Locklear had been brought into the Scott County Jail and that Locklear appeared to be delusional, that he also appeared to be in a delusional state of mind when he arrived at the jail on June 11, that he appeared not to understand where he was, that he was yelling, and that he continued to talk to imaginary people.

59. Officer Richey asked Dr. Al-Shami whether there was medication Officers could give Locklear to calm him down.

60. Dr. Al-Shami, without evaluating, speaking to, or seeing Locklear, advised Officer Richey to give Locklear 2 milligrams of Risperidone, an antipsychotic, and to continue to administer the medication twice daily for 30 days.

61. Officer Richey called Dr. Al-Shami again and asked if Locklear could be transported to Scott Memorial Hospital for an evaluation. Dr. Al-Shami told Officer Richey "yes," but, upon information and belief, never took any steps to admit Locklear or obtain transport.

62. Officer Richey then contacted Herald and informed him that Dr. Al-Shami stated that Officers could take Locklear to the hospital for an evaluation.

63. Herald again refused to allow the transportation of Locklear and instead advised the Officers to wait until it was determined whether Locklear's sister would be bailing him out the following morning.

64. Upon information and belief, by that point in time, Locklear had been in dire need of urgent medical care for several days, and was suffering from severe dehydration and pacchymeningitis.

65. Upon information and belief, Locklear was never evaluated by any medical professional during his entire stay at Scott County Jail, despite the fact that Defendant Unknown Nurse, who is believed to be an employee of Defendant Scott County and/or of Defendant Advanced Correctional Healthcare, Inc., was regularly visiting other Scott County Jail inmates during Locklear's confinement.

66. On June 14, 2014 at approximately 5:00 a.m., Locklear's sister, Jean Locklear, arrived at the Scott County Jail to post bond for Locklear.

67. Officers allowed Jean to speak to Locklear through the window of his padded cell for approximately 5 minutes before Officer Rachael Hardin escorted Jean to the lobby to wait to post bond.

68. Officers Lindsay Johnson and Scott McCoskey then gave Locklear his jean shorts through the "beanhole" in the padded cell and instructed Locklear to put them on.

69. The Officers, along with Deputy Joe Johnson, then entered Locklear's cell. Locklear, despite his apparent delusional state, complied with the order to put his shorts on.

70. However, Officers then decided that Locklear should not be allowed to have the shorts they had just given him.

71. Despite the fact that he was being released, McCoskey ordered Locklear to get on the ground so he could be handcuffed and forcibly stripped - again (this time with two women officers, Defendants Lindsay Johnson and Rachael Hardin, present in the cell). Locklear protested.

72. Officers then forced Locklear to the ground, handcuffed him, and stripped him naked again. Defendant Officer Hardin removed his shorts.

73. Upon information and belief, during this incident, Officers Lindsay Johnson and McCoskey tased Locklear at least five times, for a total of 36 seconds in a period of less than three minutes.

74. Officer McCoskey and Deputy Joe Johnson then placed Locklear in a restraint chair in his padded cell, at which point Locklear was unresponsive and not breathing.

75. Minutes elapsed before Officers removed Locklear from the restraint chair and began performing CPR.

76. An autopsy performed on June 15, 2014 determined that Locklear was suffering from renal failure, severe dehydration, and Pachymeningitis, conditions for which he never received treatment.

## **COUNT I – CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983**

*Violations by all Individual Defendants and Advanced Correctional Healthcare, Inc.*

77. Plaintiff reaffirms and incorporates by reference all allegations in the previous paragraphs of this Complaint.

78. All Individual Defendants and Advanced Correctional Healthcare, Inc., were acting under the color of state law when they undertook the actions described above.

79. All Individual Defendants and Advanced Correctional Healthcare, Inc., deprived Locklear of his rights under the Fourth, Fifth, Ninth, and/or Fourteenth Amendments to the United States Constitution.

80. All Individual Defendants and Advanced Correctional Healthcare, Inc., were repeatedly and deliberately indifferent to the obvious medical needs of Locklear, and repeatedly failed to secure him necessary and recommended medical attention.

81. Defendant Deputies and Jail Officers subjected Locklear to excessive and unreasonable force, including the use of pepper spray, the forcible removal of Locklear's clothing, and the repeated, prolonged abuse of tasers, actions which were taken as unlawful punitive measures, despite Defendants' knowledge of and with deliberate indifference to Locklear's medical needs, and which ultimately contributed to Locklear's injuries and death.

82. As state actors, Defendants' practices constitute an arbitrary use of government power, and evince a total, intentional, and unreasonable disregard for Locklear's constitutional rights.

83. Defendants were aware that their actions were substantially likely to result in violations of Locklear's constitutional rights.

84. As a result of the foregoing, Locklear was deprived of the following non-exhaustive list of rights and immunities guaranteed him by the Constitution of the United States in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983:

   a. His right to be secure in his person against unreasonable searches and seizures under the Fourth and Fourteenth Amendments;

   b. His right to the equal protection of the law, procedural due process, and substantive due process secured by the Fifth and Fourteenth Amendments;

   c. His right to privacy in his person against unreasonable intrusions under the Fourth, Fifth, Ninth and Fourteenth Amendments;

   d. His right to be free of punishment while in pretrial detention; and

   e. His right to be free of excessive force.

85. Moreover, given the pre-existing law that clearly prohibited Defendants' conduct, Defendants' abuse of Locklear was intentional, wanton and malicious, and indicative of Defendants' total and reckless disregard of/deliberate indifference to the rights and medical needs of Locklear, and shocks the conscience.

86. Those individual Defendants who did not directly participate in one or more of the abuses Locklear endured could have intervened to prevent further harm to Locklear's rights, but did not do so.

*Supervisory Liability and Failure to Train (against Defendant Herald in his Individual and Official Capacities)*

87. Defendants Herald was a final policymaker and decisionmaker for the Scott County Jail, and encouraged and/or directly participated in the misconduct undertaken by the Defendant Jail Officers, as set forth above.

88. In addition to his own deliberate indifference to Locklear's rights and medical needs, Defendant Herald was negligent and/or deliberately indifferent to Defendant deputies' and officers' need for training regarding the reasonable use of force and the rights and medical needs of pre-trial arrestees/detainees.

89. As a result of Defendant's failure to adequately train the deputies and

15

officers, the deputies and officers violated Locklear's constitutional rights and ultimately contributed to his death.

90. Furthermore, as Jail Commander, Herald was a final policymaker and had oversight responsibility for ensuring that third-party contractors were competent, and that they created and followed adequate policies regarding healthcare provided to inmates in the Scott County Jail.

91. Herald was on actual or constructive notice that the failure of Advanced Correctional Healthcare, Inc., to render adequate, competent medical care to inmates was substantially certain to result in the violation of the constitutional rights of those inmates, including Locklear.

92. As a direct and proximate result of the aforementioned conduct, Plaintiff suffered physical harm, emotional distress, mental anguish, and death.

*Supervisory Liability (against Defendant Baughman)*

93. Upon information and belief, Defendant Baughman acted in a supervisory capacity over Defendant Jail Officers, and encouraged and/or directly participated in the misconduct undertaken by the Defendant Jail Officers, as set forth above.

*Supervisory Liability (against Defendant Al-Shami and Advanced Correctional Healthcare, Inc.)*

94. Upon information and belief, Defendants Al-Shami and Advanced Correctional Healthcare, Inc., acted in a supervisory capacity over Unknown Nurse Denise, and encouraged and/or directly participated in the misconduct undertaken by her, as set forth above.

95. Furthermore, Advanced Correctional Healthcare, Inc., also acted in a

supervisory capacity over Dr. Al-Shami, and encouraged and/or directly participated in the misconduct undertaken by him, as set forth above.

### *Municipal/Organizational Liability (against Scott County and Advanced Correctional Healthcare, Inc.)*

96. Defendants Scott County, Sheriff McClain and Advanced Correctional Healthcare, Inc., were directly responsible for Locklear's injuries due to their failure (a) to adequately train and supervise their officers, employees, and contractors (b) to adequately and properly staff the Jail and provide it the resources necessary to serve the needs of persons like Locklear, and (c) to inculcate policies, customs and practices to prevent – or to investigate, discover and change or abolish the policies, customs and practices responsible for – the mistreatment he endured.

97. Defendants specific failures include, but are not limited to:

   a. Failing to train deputies and correctional officers on how to properly recognize and de-escalate situations involving mentally ill suspects and/or inmates;

   b. Inadequate staffing of its Jail facility such that medical emergencies may be properly recognized and treated in a timely fashion;

   c. Failing to train deputies and correctional officers as to the proper methods for dealing with medical emergencies, including how to properly administer CPR and other life-saving measures;

   d. Failing to adequately staff the Scott County Jail with a sufficient number of competent medical professionals;

17

  e. Failing to provide adequate monitoring and medical treatment to inmates of the Scott County Jail;

  f. Failing to train staff and third-party contractors as to the proper methods for establishing and delivering competent medical evaluation and care to inmates of the Scott County Jail;

  g. Failing to establish or follow proper protocol for evaluating and monitoring medical disorders, including mental illnesses, of inmates in the Scott County Jail; and

  h. Failing to establish or follow proper protocol for handling medical emergencies in the Jail.

98. As a result of the foregoing failures, and the other institutional failures identified in this Complaint, the inadequacy of Defendants' policies, customs, practices, and procedures was so likely to result in the violation of constitutional rights, that Defendants, by and through their final policy-makers can reasonably be said to have been deliberately indifferent to the needs of Locklear and inmates like him.

## DAMAGES

99. Plaintiff reaffirms and incorporates herein by reference all allegations contained in all paragraphs above.

100. Defendants' actions, collectively and individually, directly and proximately caused Locklear to be damaged in an amount exceeding the jurisdictional limits of this Court.

101. As set forth above, Locklear was unjustifiably and unconstitutionally

treated in a manner that ultimately led to his death and caused him tremendous and overwhelming mental and emotional distress. As a result, Plaintiff is entitled to recover actual and compensatory damages.

102.   Furthermore, Defendants' violations of the constitutional and common law rights of Locklear evinced a total and reckless disregard for and indifference to those rights, entitling Plaintiff to recover punitive damages from Defendants in order to deter such conduct in the future.

**WHEREFORE**, Plaintiff requests:

A. a trial by jury;

B. permanent injunctive relief to correct the unlawful and unconstitutional policies, practices, and procedures discussed in this Complaint;

C. an award of actual, compensatory, and punitive damages to Plaintiff;

C. an award of Plaintiff's costs and attorney fees and all other relief to which she is entitled under law or in equity; and

D. any and all other relief to which she may be entitled to under the law.

> */s/ Laura E. Landenwich*
> Laura E. Landenwich, # 27709-22
> Daniel J. Canon
> CLAY DANIEL WALTON & ADAMS PLC
> 101 Meidinger Tower
> 462 South Fourth Street
> Louisville, KY 40202
> (502) 561-2005
> *Counsel for Plaintiff*